## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PARTNERS HEALTHCARE SOLUTIONS HOLDINGS, L.P., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 13-1767-RGA |
| v. | ) ) | |
| UNIVERSAL AMERICAN  CORP., | ) ) | |
| Defendant. | ) ) | |

## EXHIBIT 1 TO DEFENDANT UNIVERSAL AMERICAN CORP.'S
## OPENING BRIEF IN SUPPORT OF ITS
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

*Of Counsel:*

Andrew J. Levander
Linda C. Goldstein
Paul C. Kingsbery
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
212-698-3500
andrew.levander@dechert.com
linda.goldstein@dechert.com
paul.kingsbery@dechert.com

Stuart T. Steinberg
Elisa T. Wiygul
Dechert LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
215-994-4000
stuart.steinberg@dechert.com
elisa.wiygul@dechert.com

Dated: November 27, 2013

Blake Rohrbacher (# 4750)
Kelly E. Farnan (#4395)
Katharine C. Lester (#5629)
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801
302-651-7700
rohrbacher@rlf.com
farnan@rlf.com
lester@rlf.com

*Attorneys for Defendant Universal American Corp.*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNIVERSAL AMERICAN CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-_____ |
| | ) | |
| PARTNERS HEALTHCARE SOLUTIONS | ) | |
| HOLDINGS, L.P., GTCR GOLDER | ) | |
| RAUNER II, L.L.C., GTCR PARTNERS IX, | ) | |
| L.P., GTCR FUND IX/A, L.P., GTCR FUND | ) | |
| IX/B, L.P., GTCR CO-INVEST III, L.P., | ) | |
| DAVID KATZ, GREGORY SCOTT, | ) | |
| JEROME VACCARO and JOHN | ) | |
| McDONOUGH, | ) | |
| | ) | |
| Defendants. | ) | |

**Complaint**

Plaintiff Universal American Corp. ("Universal"), for its Complaint against Defendants

Partners Healthcare Solutions Holdings, L.P. ("APSLP"), GTCR Golder Rauner II, L.L.C.

("GTCR"), GTCR Partners IX, L.P. ("GTCR Partners IX"), GTCR Fund IX/A, L.P. ("GTCR

Fund IX/A"), GTCR Fund IX/B, L.P. ("GTCR Fund IX/B"), GTCR Co-Invest III, L.P. ("GTCR

Co-Invest") and David Katz ("Katz" and, together with GTCR, GTCR Partners IX, GTCR Fund

IX/A, GTCR Fund IX/B, and GTCR Co-Invest, the "GTCR Defendants"), Gregory Scott

("Scott"), Jerome Vaccaro ("Vaccaro"), and John McDonough ("McDonough," and together

with Scott and Vaccaro, the "Individual Defendants"), states as follows:

### Summary of the Action

1.       This action seeks redress for the fraudulent sale of Partners Healthcare Solutions,

Inc. ("APS" or the "Company") to Universal in March 2012.  APS is a specialty healthcare

company providing care management, behavioral health, and disease management services to

state Medicaid agencies and private health plans.  APSLP, the GTCR Defendants and the

Individual Defendants (collectively, "Defendants") knew that APS's business was disintegrating

but nonetheless fraudulently induced Universal to purchase APS for $222.3 million through a

systematic course of material misrepresentations and omissions calculated to camouflage the

truth.

2.       These misrepresentations and omissions included, among others: (a) contractual

representations and warranties that APS was not in default of any of its material contracts; (b)

contractual representations and warranties that there had been no material adverse changes in

Universal's business; (c) contractual representations and warranties that APS owned outright a

computer software program that it described as the "chassis" of its business; (d) a budget

representing that APS would achieve 2012 earnings before interest, taxes, depreciation and

amortization ("EBITDA") of $25.5 million from its existing contracts; and (e) a budget and other

documents asserting that APS would achieve 2012 EBITDA of $19.3 million from a pipeline of

contracts that had been "won" or that it was "highly likely" to win.

3.       Immediately after the Defendants received their payments for the deal, the ugly

truth about APS's business began to emerge as *all* of these representations (and many others)

turned out to be false and misleading.  Within two weeks after the transaction closed, Universal

learned that APS's single largest customer, representing 40 percent of the Company's revenues,

had told Defendants prior to closing that APS was in default of its contract; that customer later

levied a $5 million fine.  Similarly, within a few months, Universal learned that—as APS well

- 2 -

knew and anticipated—many of APS's largest customers were terminating their contracts or had cut back on the services that APS would be providing to them. A new contract that Defendants represented had already been "won" by APS was in fact awarded to a competitor. The pipeline of new business that Defendants had concocted for Universal's consumption dematerialized; of more than 30 potential contracts that APS had identified as likely to provide revenue in 2012, *only two* in fact generated revenue in that year. When Universal sought to develop an upgrade of APS's key software program, it learned that nearly half of its code came from software *licensed* from a third party, contrary to Defendants' representation that APS *owned* that critical software. Similarly, shortly before Universal executed the agreement to acquire APS, APS gave Universal a 2012 budget forecasting that APS would earn $44.8 million in EBITDA; APS confirmed that budget again only two days before the merger closed on March 2, 2012. But within six weeks of closing, Universal was told that the forecast had dropped 40 percent, to $27.1 million; within four months of closing, Universal was told that the forecast was down 90 percent, at $4.1 million. Upon receiving this news, Universal imposed unplanned corporate expense reductions, enabling APS to eke out $8 million EBITDA in 2012.

4.      These disastrous results were not a product of happenstance. Rather, Defendants engaged in a deliberate campaign to conceal the truth about APS prior to the close of the transaction. The avalanche of bad news about APS's business that did not come to Universal's attention until just after the March 2, 2012 closing, the complete evaporation of APS's income within months, and the sheer number of misrepresentations and omissions in the Merger Agreement, dated as of January 11, 2012 (the "Merger Agreement") and Defendants' other statements to Universal are all telltale signs of fraud. But while the circumstantial evidence of Defendants' fraudulent intent is powerful, the specific examples of Defendants' actual knowledge that their representations were false are irrefutable. For example:

- 3 -

(a)     At a meeting with a senior official and representative of APS's largest customer, Customer A, Defendants Scott and Vaccaro were told that APS was in breach of its contract, that a fine would be levied and that the Company was at risk of losing the contract altogether. Universal had asked Scott and Vaccaro numerous times about the status of this important customer contract, but neither of them mentioned the meeting or the troubling message that had been delivered to them.  To the contrary, APS expressly represented in the Merger Agreement that it was not in breach of the contract with Customer A, and that it had not received any indication that the important contract with Customer A might be terminated.

(b)     Another important APS customer, Customer B, sent APS a written notice telling the Company that it had not complied with the terms of the parties' contract and had imposed a Corrective Action Plan.  APS nonetheless expressly warranted in the Merger Agreement that it was not in breach of Customer B's contract.

(c)     APS was required to notify Universal of all known material adverse effects prior to the closing of the merger, but did not inform Universal of the loss of a material contract with Customer C or other material adverse effects that together reduced APS's 2012 EBITDA by more than $11 million, or 25 percent.  Defendants were well aware of these serious problems *before* Universal acquired APS, and knew of their catastrophic impact on APS's 2012 budget; nonetheless, Defendants fraudulently confirmed the 2012 budget as late as February 29, 2012 and misrepresented at the closing on March 2, 2012 that no material adverse effects had occurred.

(d)     APS's presentations to Universal highlighted its "proprietary" computer software (the "Software"), which it described as the "chassis" of the Company's service offerings.  In the Merger Agreement and Company Disclosure Letter, APS represented that it "owned" the

- 4 -

Software. On the contrary, the Software was just a customization of a product licensed from a third party, as APS's senior executives knew.

(e)     APS's presentations to Universal emphasized a "pipeline" of new contracts that it anticipated would yield revenue in 2012. The presentations, which were reviewed and approved by GTCR, inflated the probabilities and the revenue for these prospects. The pipelines that Defendants fed to Universal bore little connection to reality or to the internal pipeline documents that were prepared by the APS development team, distributed to Vaccaro and McDonough, and discussed by all of the Individual Defendants at monthly meetings. The Defendants' own emails show that they fraudulently reverse-engineered the Universal pipeline presentations to generate EBITDA projections that would mask the deterioration of APS's business.

5.     Defendants' systematic misrepresentations and omissions regarding APS's business constitute securities fraud and common law fraud. In addition, Defendant APSLP has breached the covenants, representations, and warranties in the Merger Agreement.

## Parties

6.     Plaintiff Universal is a corporation organized under the laws of the State of Delaware, with its principal place of business in White Plains, New York. Universal's common stock is publicly traded on the New York Stock Exchange.

7.     Defendant GTCR, a Delaware LLC, is a private equity firm with its principal place of business in Chicago, Illinois. GTCR is general partner of Defendants GTCR Co-Invest and GTCR Partners IX.

8.     Defendant GTCR Partners IX is the general partner of Defendants GTCR Fund IX/A and GTCR Fund IX/B, and is a limited partnership organized under the laws of the State of Delaware.

- 5 -

9.      Defendants GTCR Fund IX/A, GTCR Fund IX/B, and GTCR Co-Invest (collectively, the "GTCR Limited Guarantors") are limited partnerships organized under the laws of the State of Delaware. Under the Limited Guaranty provided for by the Merger Agreement, the GTCR Limited Guarantors guaranteed the indemnification obligations of Defendant APSLP, as described more fully below.

10.     Defendant David Katz is a Managing Director of Defendant GTCR and co-head of its healthcare group. Katz was a member of APS's Board of Directors before Universal acquired APS. On information and belief, Katz is a resident and citizen of the State of Illinois.

11.     Defendant APSLP is a Delaware limited partnership that was formed by the GTCR Defendants in 2007 to hold APS. Each of the GTCR Limited Guarantors and each of the Individual Defendants is a limited partner of APSLP.

12.     Non-party APS is a Delaware corporation with its principal place of business in White Plains, New York.

13.     Defendant Gregory Scott was, prior to the acquisition of APS by Universal, the Chief Executive Officer of APS. Scott became co-President of Universal. Scott also served as President and Chief Executive Officer of APSLP and signed the Merger Agreement on behalf of both APSLP and APS. Scott is a resident and citizen of the State of California.

14.     Defendant Jerome Vaccaro was at all times relevant to this Complaint the President of APS and, until approximately March 2012, its Chief Operating Officer. Vaccaro also served as Vice President of APSLP. Vaccaro is a resident and citizen of the State of New York.

15.     Defendant John McDonough was at all times relevant to this Complaint the Chief Financial Officer of APS. McDonough also served as Treasurer of APSLP. McDonough is a resident and citizen of the State of New Jersey.

- 6 -

### Jurisdiction and Venue

16.     This action includes claims arising under Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1367(a) (supplemental jurisdiction), and Section 27 of the Exchange Act.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. §1391(b), and the consent to jurisdiction and venue provisions in the Merger Agreement and related agreements.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, or the facilities of the New York Stock Exchange, a national securities market.

20.     In Section 8.8(a) of the Merger Agreement, APSLP agreed to submit to the jurisdiction of this Court for any action arising out of or relating to the Merger Agreement.

21.     Under Section 16 of the Limited Guaranty provided to Universal at Closing, the GTCR Limited Guarantors agreed to submit to the jurisdiction of this Court for any action arising out of or relating to the Limited Guaranty.

### Background Facts

#### The Businesses of Universal and APS

22.     Universal provides healthcare products and programs, including Medicare Advantage plans. Through its family of healthcare subsidiaries, Universal provides insurance and health benefits primarily to people enrolled in the federal Medicare program, working

- 7 -

together with healthcare professionals in order to improve the health and well-being of plan members.

23.     APS provides specialty healthcare solutions primarily to state Medicaid agencies. APS Healthcare offers a broad range of healthcare solutions, including case management and care coordination, clinical quality and utilization review, and behavioral health services that enable its customers to improve the quality of care and reduce healthcare costs. APS uses the Software to provide these services.

24.     A significant portion of APS's business involves serving as a contractor to public entities, primarily state Medicaid agencies. In general, APS enters into these contracts as a result of a competitive bidding process, in which the state agencies issue requests for proposals ("RFPs") detailing the services they require. APS also contracts with private health plans, often as a subcontractor when the private health plan contracts with public entities.

25.     Many of APS's contracts with state agencies permit the counterparty to terminate the contract at its convenience, without cause. Non-compliance with contract terms may also have regulatory consequences. Accordingly, maintaining high levels of contract performance, contract compliance and customer satisfaction are essential to APS's continued business and financial health.

**GTCR Acquires APS**

26.     GTCR is a private equity firm with approximately $7 billion in assets under management. In 2007, GTCR acquired APS for $285 million. APSLP was formed in order to hold APS for the benefit, upon information and belief, of the GTCR Limited Guarantors or other GTCR affiliates. Upon information and belief, when the GTCR Defendants acquired APS, they intended to hold APS for three to five years and then sell the Company at a profit.

- 8 -

27.     At all times relevant to this Complaint, GTCR controlled APS and its board.  The five-member board of directors was comprised of Defendant Scott, Defendant Katz, Nolan, Douglas Present, and Ruben King-Shaw.  Defendant Katz was a Managing Director of GTCR who had been associated with the firm since 2006; Nolan had been a Principal at GTCR since 1996.  Douglas Present was the former Chairman and CEO of Managed Health Care Associates and, according to GTCR's website, was one of GTCR's "Management Leaders."

28.     Other GTCR personnel also interacted directly with APS senior management. Those individuals included Joshua Earl, who became a GTCR Principal in 2012, and John Kos, who became a GTCR Vice President in 2011.

29.     On its website, GTCR touts its "strong proactive efforts" at its portfolio companies.  Those efforts were evident here:  Defendant Katz, Nolan, Earl, and Kos all maintained close contact with Scott and Vaccaro through frequent telephone conversations and e-mail messages; moreover, Defendant Katz and Nolan and other board members met at least quarterly to review APS's business and financial results.

**APS's Financial Performance Disappoints GTCR**

30.     APS was a disappointing acquisition for GTCR.  The Company was never able to show consistent growth.  When GTCR acquired APS for $285 million in 2007, the Company earned $26.9 million in EBITDA.  APS managed to generate over $40 million EBITDA in 2008 and 2009, but that figure declined in 2010.  For 2011, APS budgeted $332.3 million in revenue and $35.4 million in EBITDA but ultimately took in only $313.3 million in revenue, corresponding to $31.7 million in EBITDA.

31.     GTCR's efforts to turn the Company around were not successful.  The Company was losing contracts with existing customers; as Defendant Katz acknowledged in a November 30, 2011 email to Defendant Scott, the "contract churn is killing us."  Moreover, some of the

- 9 -

new contracts that the Company was signing were not profitable. In early 2011, APS learned that it had seriously underestimated the cost of performing a new contract for Customer D, the Company's third largest contract. As a result, the contract was far less profitable than budgeted, losing money by the end of 2011. By the end of the second quarter of 2011, the contract with Customer D was $1.5 million behind budget for that quarter alone, as reflected in a July 28, 2011 Financial Performance report that McDonough presented to APS's Board of Directors.

32.     Private equity funds such as GTCR commonly hold their investments for a five-year period. But as Defendant Katz stated in a June 16, 2011 email to Defendant Scott, it had become apparent to the Defendants that GTCR's plan to sell APS by 2012, which would be five years after its initial investment, was "increasingly aggressive and unrealistic" given APS's inability to maintain its existing customer base or to show consistent growth. In June 2011, GTCR summoned Scott to a meeting in Chicago to address its concerns. By that time, GTCR expected that it would have to hold its investment in APS for at least another two to four years.

33.     The situation was exacerbated by APS's debt burden. In 2011, APS had approximately $150 million of debt on its balance sheet. Beginning in September 2011, APS was in breach of certain of its loan covenants. If the banks were to declare a default on APS's loans and foreclose on GTCR's equity interest in APS, GTCR would lose its entire $285 million investment in the Company.

**The Parties Engage in Merger Discussions in the Late Summer and Fall of 2011**

34.     In late summer 2011, Universal's chairman, wholly unaware of APS's struggles and problems, suggested in a conversation with Defendant Scott that a strategic combination of APS and Universal might make sense. At the time, GTCR had all but abandoned hope of selling APS within its initial five-year target, and was at risk of losing its entire investment. The Defendants immediately seized upon this lifeline and commenced discussions with Universal.

- 10 -

35.     In connection with their sales efforts, the Individual Defendants made a presentation to Universal senior management on August 18, 2011.  GTCR's Earl was present at this meeting and conveyed what had happened at the meeting to Defendant Katz and, on information and belief, Nolan.  This presentation (the "August Presentation") included, among other things:

(a)     projected income statements for 2012 through 2016, which forecast $52 million in EBITDA for 2012;

(b)     the annual EBITDA contributions from APS's most significant contracts and the contracts' maturity dates, including an assertion that the contract with Customer D generated millions of dollars of EBITDA annually, even though the Defendants were all aware of that contract's unprofitability;

(c)     a robust pipeline of new business anticipated in 2012, projected to generate $31.7 million in EBITDA in 2012;

(d)     statements that APS expected to expand its contracts with multiple states, including Customer E and Customer F; and

(e)     a statement that the Software used to provide APS's services was a "proprietary, web-based and HIPAA compliant platform."

36.     On October 7, 2011, the Individual Defendants made a presentation to the Universal Board of Directors.  The presentation (the "October Presentation") included all of the projections and other statements described in paragraph 35, above.  In particular, the presentation projected the same $52 million in EBITDA for 2012 and $31.7 million in EBITDA from new business as had the August Presentation.

37.     The Individual Defendants knew, however, that the business pipeline had deteriorated in the interim; Defendant McDonough had prepared updated slides projecting only

- 11 -

$26.5 million in EBITDA from new business, a decline of $5.2 million (or 17 percent) since the August Presentation six weeks earlier. These slides were not included in the October Presentation, purportedly because of a clerical error. But even though the Individual Defendants were alerted to the putative error before making the presentation, they still proceeded to present the incorrect and grossly overstated numbers without any correction.

38.     The Individual Defendants had powerful motives to conceal the truth about APS's business from Universal. In a Universal transaction, they would be able to exchange their illiquid and worthless APS shares for valuable, publicly traded shares of Universal. They would also increase their personal compensation by as much as 40 percent, as detailed in paragraph 105, below. The GTCR Defendants had an even greater motivation—to avoid the loss of their entire investment in the event of a default.

39.     Based on Defendants' presentations and representations, Universal expressed its interest in acquiring APS after the October 7 meeting. Universal and APS tentatively agreed upon a purchase price. Universal undertook a due diligence process in which it engaged a Medicaid consulting firm, a "Big Four" accounting firm and two prominent law firms to help it examine APS.

**APS's Business Continues to Deteriorate**

40.     After its discussions with Universal had commenced, APS learned of serious threats to its existing contracts. On November 16, 2011, Defendants Vaccaro and Scott received a message from a board member of Customer A—APS's largest customer, and a governmental entity—who also had been assigned by the Governor of Customer A to oversee Customer A's Medicaid operations. The message stated: "For the last few months we have been discussing with your local management several areas of concern pertinent to APS's operations which I

- 12 -

believe you should be aware of." The APS contract with Customer A generated $130.6 million in revenue, or 41.7 percent of the Company's total 2011 revenue of $313.3 million.

41.     Vaccaro immediately recognized the gravity of the situation, writing to Scott, "[t]his is very concerning." Early on the morning of November 22, 2011, Defendants Scott and Vaccaro and another APS executive met in New York with the representative of Customer A.

42.     Vaccaro's concern was justified. At the November 22 meeting, Customer A complained that APS was in breach of its contract because, among other things, APS had not provided on-site mental health services at one-third of the sites that were covered by the contract; did not have two in-patient facilities in each of the customer's geographic regions, as required by the contract; and was not properly handling either member calls or provider payments. The Customer A contract mandated professional support at every one of its sites. Defendants Scott and Vaccaro were told that Customer A intended to send APS a notice of deficiency and impose a fine.

43.     In fact, as Defendant Scott said in an e-mail that he sent to Defendant Vaccaro and the head of APS's operations for Customer A on November 22, 2011, he understood Customer A to be threatening "the loss of our contract." He followed up by meeting with the Governor of Customer A on December 1, 2011. On information and belief, Defendant Katz and Nolan were informed of both of these meetings shortly after they occurred.

44.     In October 2011, a private health plan customer, Customer B, informed APS in writing of material deficiencies in the performance of a contract for services in California. Defendant Vaccaro met directly with Customer B to discuss those breaches. Shortly thereafter, Customer B imposed a Corrective Action Plan on the Company. Although Customer B had previously contemplated that the California contract, which began in June 2011, would be expanded to other states, APS was notified in October 2011 that Customer B would not partner

with APS in one of those states, South Carolina. Subsequently, in or around early November, APS was informed that Customer B would not award *any* new business to APS until the Company's performance in California improved.

45.     Also around this time APS learned that Customer F, where APS had its second-largest contract, was likely moving patients then served by APS's Primary Care Case Management ("PCCM") contract into managed care, which would result in a significant loss of revenue and profits.

46.     In addition to these threats to its existing contracts, APS's pipeline of new business was in free fall. On November 15, 2011, Defendant McDonough prepared another iteration of the new business pipeline for presentation to Universal at a meeting the following week. This draft pipeline, which was circulated to Defendant Scott and Defendant Vaccaro (but not to Universal), projected only $18.1 million in EBITDA from new business for 2012, a dramatic decline of 43 percent from the $31.7 million that had been shown to Universal in August and October.

47.     APS was also in breach of its loan covenants. On September 30, 2011, APS went into default on its covenants regarding capital expenditures. By October 31, 2011, the Company was also in default of its covenants regarding the ratio of Adjusted Debt to EBITDA and the ratio of Senior Adjusted Debt to EBITDA. In an email exchange between Defendant Scott and Nolan on November 30, 2011, Scott acknowledged the gravity of a covenant default and its impact on APS's future prospects: "[W]e probably cannot win another piece of business if we are in default, so the whole thing will then come crashing down."

**Discussions Between Universal and APS Break Down**

48.     On November 22, 2011, Universal and APS held a meeting to discuss the potential acquisition (the "November Meeting"). Defendants Scott, Vaccaro and McDonough

- 14 -

attended the meeting, as did Defendant Katz and Earl of GTCR.  During this meeting, APS made another written presentation to Universal, this time with updated projections.  Defendants utterly failed to tell Universal the truth about their deteriorating business:

      a.     APS did not tell Universal that the new business pipeline had dropped from $31.7 million to $18.1 million, as McDonough had concluded just a few days earlier.  Rather, after Defendants McDonough, Vaccaro and Scott had met to discuss the draft presentation, the Defendants presented Universal with a new bogus version of the pipeline showing that APS projected $28.6 million EBITDA from new business and a budget showing that APS projected $46.7 million of total EBITDA in 2012.

      b.     Nor did any of the Defendants say anything about the meeting earlier that same day among Defendants Scott and Vaccaro, and Customer A, in which APS had been told about substantial breaches in the performance of its contract and the potential for a fine and possible loss of the contract.  The Defendants maintained their silence even though they knew that Universal was keenly interested in this important contract and had asked APS to come to the meeting prepared to address "provider disputes in [Customer A's location] and any reserves," as spelled out in a November 19, 2011 email from Universal's chief financial officer.  They presented an estimate for 2012 EBITDA that included earnings from the contract with Customer A, even though they knew that the contract was at risk and that APS faced, at the least, a substantial fine.

      49.     APS also tried to hide what it had learned about the potential for a significant reduction in its contract with Customer F, a state agency.  But Universal had independently learned about the potential move to managed care in that state, and confronted APS and GTCR with this information at the November 22 meeting.  The Defendants downplayed the significance of the move and suggested that APS would have other opportunities with Customer F, and that

- 15 -

the income from Customer F might even increase. The discussion foundered and the meeting ended.

50.     Shortly afterwards, Universal told GTCR and APS that it was no longer willing to acquire APS at the price the parties had been discussing. Universal explained to GTCR that it was concerned about the significant effect that a reduction in the contract with Customer F would have on APS's business. In addition to the loss of revenue and income, as a result of this change APS would be even more heavily dependent on a single large customer, Customer A.

**Universal Offers to Acquire APS at a Lower Price**

51.     Discussions between Universal and GTCR resumed when Defendant Katz later suggested that Universal make a reduced offer. APS and GTCR provided Universal with additional financial information. In particular, on December 12, 2011, APS sent financials including estimated 2011 results (including EBITDA) and projected results, including EBITDA, for 2012 through 2016 (the "2012 Projections"). On December 30, 2011, APS sent Universal its 2012 budget (the "2012 Budget"), this time forecasting $44.8 million in total EBITDA in 2012. APS also sent Universal an updated new business pipeline (the "December 30 Pipeline").

52.     APS lacked any reasonable basis to believe that it could attain the revenue and EBITDA projected in the 2012 Budget and the December 30 Pipeline. APS knew that it was misrepresenting the probabilities of winning several of these opportunities, in particular the four opportunities with Customer B. Indeed, APS's internal documents described the potential contract with Customer B in South Carolina as "lost" and the contemporaneous presentations made to the APS board (including GTCR's Katz and Nolan) ceased listing it as a prospect. Nonetheless, the December 30 Pipeline given to Universal described that "lost" prospect in South Carolina as 75 to 90 percent "likely" to be awarded to APS. APS's internal documents

- 16 -

also said that *no* new contracts would be awarded to APS by Customer B unless APS fixed the

shortcomings in its performance in California.

53.     The 2012 Budget that APS sent to Universal assumed that all of its existing

contracts would continue through their full term. The budget also reflected APS's purported

expectation that a contract with Customer E covering Seniors and Persons with Disabilities

("SPD") would expand in 2012 to include 30,000 new rural members. The budget also assumed

that APS would win the rebid of a contract for Population Health Management ("PHM") with

Customer G, even though the Defendants all knew that was unlikely to occur.

54.     In December 2011, Universal personnel visited APS facilities in Customer A's

location as part of their due diligence for the transaction. Defendants were concerned that

Universal might discover that APS was in breach of its contract with Customer A; Defendant

Katz wrote to Defendant Scott, "the less time there the better." Although Universal requested an

opportunity to speak with Customer A personnel during that visit, Defendants refused to arrange

for a meeting, claiming that it was inappropriate to do so because Universal had not yet signed a

contract. In fact, Defendants' real motivation was fraudulently to conceal Customer A's strained

relationship with APS, its claim that APS was in breach of its contract, and the threat to

terminate that contract.

55.     Universal was aware that APS had entered into a Corporate Integrity Agreement,

dated February 18, 2011, with the Office of the Inspector General of the Department of Health

and Human Services, to resolve a False Claims Act lawsuit. As a result, Universal's due

diligence paid close attention to APS's efforts to monitor compliance with its contracts. APS

executives (including Defendant Scott) assured Universal at a meeting in APS's offices on

January 4, 2012 that APS had remedied any shortcomings in its compliance programs identified

- 17 -

as part of the False Claims Act case and that APS was now in compliance with its contracts and all applicable laws.  Defendant Katz of GTCR participated in this meeting by telephone.

56.     Based on APS's false representations and omissions, Universal offered to pay $227.5 million to acquire APS.  The offer reflected a 7.58 multiple to APS's anticipated 2011 EBITDA of $30 million.  Universal also offered to make an additional payment should APS's post-acquisition performance in 2012 and 2013 meet certain thresholds.

**The Merger Agreement**

57.     On January 11, 2012, Universal, APSLP and APS entered into the Merger Agreement, pursuant to which APS was to be merged into a subsidiary of Universal.  The Merger Agreement provided that $80 million of the $227.5 million purchase price was payable to APSLP in the form of shares of Universal common stock, while the rest was payable in cash. The Merger Agreement also provided for an additional payment should APS's 2012 EBITDA exceed $30 million.

58.     As material inducements for Universal to enter into the Merger Agreement, the Company made extensive representations and warranties to Universal in Article 3 of the Merger Agreement.  Among other things, APS represented and warranted that:

(a)     the Company was not in material breach or default of any of its material contracts, except as disclosed in the Company Disclosure Letter, and that to its knowledge, including the knowledge of Defendants Scott, Vaccaro and McDonough, none of its counterparties had "indicated to the Company or any of its Subsidiaries its intent to cancel, terminate or modify . . . in a manner adverse in any material respect to the Company" any material contract.  Merger Agreement § 3.17;

(b)     more specifically, that there was no breach, violation or default of the contract with Customer A, except as disclosed in Section 3.29 of the Company Disclosure Letter, and that

- 18 -

APS had not "received written notice of any such breach, violation or default" of the contract with Customer A. Merger Agreement § 3.29. The Company Disclosure Letter, in turn, disclosed only that APS was "discussing the appropriate measure of network adequacy (for providers with multiple offices) with [Customer A]," without mentioning the other contract deficiencies discussed during the November 22, 2011 meeting and without disclosing that APS had been told at that meeting that it would receive a notice of deficiency and be assessed a substantial fine;

(c)      since January 1, 2006, the Company had not violated or incurred any material liabilities under any healthcare laws ("Healthcare Laws"), and that to its knowledge, including the knowledge of Defendants Scott, Vaccaro, and McDonough, there were no facts, circumstances or events that could reasonably be expected to give rise to such liability. Merger Agreement § 3.25(a);

(d)      since March 23, 2011, the date of its prior audited financial statements, except as disclosed in the Company Disclosure Letter, there had "not been any fact, event, circumstance, change, occurrence, effect or condition that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect." Merger Agreement § 3.9;[1] and

(e)      the Company "owned" certain software enumerated in the Company Disclosure Letter. Merger Agreement § 3.16(a).

---

[1]      A Company Material Adverse Effect is defined in Section 1.1 of the Merger Agreement as "any fact, event, circumstance, change, occurrence, effect or condition which, individually or in the aggregate (taking into account all other such facts, events, circumstances, changes, occurrences, effects or conditions), has had or would reasonably be expected to have a material adverse effect on (A) the financial condition, business or results of operations of the Company and its Subsidiaries, taken as a whole, or (B) the ability of the Company to timely consummate the transactions contemplated hereby." The definition explicitly provides that "any fact, event, circumstance, change, occurrence, effect or condition underlying any failure to meet any . . . projections, forecasts or revenue or earnings predictions [for any period ending on or after the date of this Agreement] shall be taken into account in determining whether a Company Material Adverse Effect has occurred or would reasonably be expected to occur."

- 19 -

59.     Universal reasonably relied upon the representations and warranties in the Merger Agreement when it executed that agreement.  Although the broad contours of APS's business and the nature of its customers were known to Universal, it was impossible for Universal to know the specific information that Defendants either misrepresented or concealed regarding those representations.

60.     In addition to making these representations and warranties, the Company also made a number of covenants as to the conduct of its business, including information to be provided to Universal, during the period from January 11, 2012 through the closing.  Those covenants included, among others, that prior to Closing, APS would "promptly" notify Universal if it obtained "Knowledge of any fact, event, circumstance, change, occurrence, effect or condition that [APS] believes would reasonably be expected to cause any of conditions to Closing set forth in Section 6.1 or Section 6.2 to be not satisfied or fulfilled."  Merger Agreement § 5.2(h).  "Knowledge" includes matters known to Defendants Scott, Vaccaro and McDonough.

61.     As conditions to closing, Section 6.2 of the Merger Agreement required that: the representations and warranties of the Company be true and correct as of the date of closing (Merger Agreement § 6.2(a)); the Company shall have complied with all of its covenants under the Merger Agreement (Merger Agreement § 6.2(b)); and there shall have been no "event, development or occurrence of any condition that has had, or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect," on APS's business or financial condition (Merger Agreement § 6.2(c)).  At closing, APS was obligated to provide "a certificate of an officer of the Company, dated the Closing Date," certifying APS's compliance with each of these conditions.  Merger Agreement § 6.2(h)(i).

- 20 -

**The Deterioration of APS's Business Between Signing and Closing**

62.     After the Merger Agreement was executed, APS's customer relationships and business prospects accelerated their downward spiral. Except as otherwise noted below, none of these facts was disclosed to Universal as required by the Merger Agreement:

(a)     At a meeting held on or about January 17, 2012, APS employees learned that Customer H had not mandated that physicians and other providers use the Company's web-based portal for "utilization management," *i.e.*, the submission of requests of approval for services. As a result, Vaccaro and, on information and belief, the other Defendants, knew that APS would experience a significant shortfall in the net income that it had projected for that contract in 2012 but failed to inform Universal of this fact.

(b)     One of APS's largest contracts was to provide services for Customer E's Adult Day Health Care ("ADHC") program. The 2012 budget contemplated that this contract would contribute over 10 percent of APS's projected 2012 budget of $44.8 million in EBITDA. Beneficiaries of ADHC sued Customer E; in a settlement announced in November 2011 and approved by the court in January 2012, after the Merger Agreement was signed, many participants in the program would be moved to managed care programs, and hence would no longer be served by APS. Vaccaro, McDonough, and, on information and belief, the other Defendants, were aware of the adverse impact that this settlement would have on APS's business but failed to inform Universal of this fact. To the contrary, McDonough fraudulently concealed the impact by telling Universal that the settlement would give APS an opportunity to *expand* its programs with Customer E.

(c)     On or about January 20, 2012, APS was told that a new contract with Customer E's County Medical Services Program ("CMSP"), with projected annual revenue of $4 million, would be reduced in scope to $2 million. Vaccaro, McDonough, and, on information

- 21 -

and belief, the other Defendants, were aware of the reduction but failed to inform Universal of this fact.

(d)     By letter dated February 1, 2012, Customer B notified APS that it was terminating its California contract with APS. On February 15, 2012, Customer B sent APS a post-termination letter, addressed to Defendant Vaccaro, referring to the Company's "material deficiencies" in performance. APS informed Universal of this termination but did not tell Universal of the role APS's defective performance had played in that termination or that its prior predictions of increased business with Customer B were baseless. APS did not even send Universal a copy of the February 15 letter citing APS's "material deficiencies." To the contrary, APS falsely informed Universal's chief executive officer and board that Customer B had terminated the contract because it did not want to do business with a Universal-owned company.

(e)     APS's contractual relationship with Customer C had begun in 2005, and was one of the Company's longest standing and most successful relationships. The 2012 budget given to Universal contemplated that a five-year renewal of the contract with Customer C would contribute more than five percent of the budgeted $44.8 of million EBITDA for 2012. On February 1, 2012, Defendants Vaccaro and McDonough received written notice that Customer C would be putting out a new RFP for the five-year renewal, which had previously been awarded to APS. APS was told that the new RFP had been issued because the newly appointed Customer C director did not want to hire APS because the Company had paid a $13 million fine for alleged violations of the federal False Claims Act and state law. Defendants Scott and Vaccaro knew of Customer C's concern about the False Claims Act settlement. Under these circumstances, it was virtually certain that Customer C would not award the contract to APS. Even though the Defendants knew that APS had lost the contract with Customer C, they failed to inform Universal of that fact or the new RFP.

- 22 -

(f)     On or about February 6, 2012, APS learned that one of its competitors had been selected for the renewal of the PHM contract with Customer G for a term beginning July 1, 2012 and, accordingly, that the revenue and income for that contract in APS's 2012 budget would have to be reduced. McDonough, Vaccaro and, on information and belief, the other Defendants, were aware of this loss and the impact it would have on APS's 2012 budget but failed to inform Universal of those facts.

(g)     On February 13, 2012, Customer D notified APS by letter that Customer D would put APS's existing contract with Customer D out for rebid for the contract year starting January 1, 2013. APS's contract with Customer D, its third largest contract, would otherwise have lasted until 2015. APS's general counsel did not forward this letter to Universal until February 29, 2012—more than two weeks after receiving it, and only two days before the scheduled closing of the merger. Critically, none of the Defendants informed Universal that Customer D was dissatisfied with APS's performance and therefore unlikely to award the rebid contract to the Company.

(h)     After the Merger Agreement was signed, in mid-January 2012, each of the Individual Defendants and, on information and belief, the other Defendants, became aware that APS's 2012 EBITDA budget had been overstated by $1.5 million as a result of a purported error in calculating the earnings from APS's largest contract, Customer A. Universal was not informed of this error or its negative impact on APS's 2012 budget.

63.     These events, individually and in the aggregate, had a material adverse effect on APS's business. Shockingly, APS did not tell Universal about most of these events. For the few events it was compelled to disclose, such as Customer E's settlement of the litigation over its ADHC program, APS continued to deceive Universal by asserting that they would have a positive impact on APS's business.

- 23 -

64.     Notwithstanding the torrent of undisclosed bad news, APS repeated its rosy projections for 2012 when it had no reasonable basis to do so.  For example:

(a)     On February 2, 2012, APS delivered to Universal the last new business pipeline that Universal would receive before Closing (the "February 2 Pipeline").  That pipeline camouflaged known losses of contracts that had previously been in the pipeline, such as the prospective contracts with Customer B that APS could no longer pretend were plausible opportunities, by adding eight new contracts that had not appeared on any previous pipeline, accounting for $4.7 million in projected 2012 EBITDA contribution.  Only one of these eight new contracts was ever executed, resulting in 2012 EBITDA of $250,000.

(b)     The February 2 Pipeline showed the same level of 2012 EBITDA contribution from the contract with Customer H as APS had provided to Universal in the December 30 Pipeline, even though the EBITDA contribution projection could no longer be valid after the January 17, 2012 meeting in which APS learned that Customer H would not mandate use of APS's web portal.  APS's cost projections had assumed that physicians would use the web portal, but without the mandate, APS was forced to incur significant additional costs.

(c)     On or about February 14, 2012, Defendant McDonough spoke with Universal's chief financial officer to discuss APS's January 2012 results.  On that call, McDonough reaffirmed APS's 2012 budget forecast.  This affirmation implied that APS would see income from the Customer C contract then subject to rebidding and would receive all projected income from the PHM contract with Customer G for the rest of the year, and concealed the $1.5 million error in the budget for the contract with Customer A.  McDonough also assured Universal's chief financial officer that APS's 2012 results would recover from a 14 percent shortfall ($293,000) in APS's January 2012 EBITDA.

- 24 -

(d)    On or about February 29, 2012, Universal's chief financial officer spoke with Defendant McDonough for a pre-Closing update on APS's financial condition.  During this call, McDonough again fraudulently reaffirmed APS's bogus 2012 budget forecast of $44.8 million EBITDA.

65.    Defendant McDonough's confirmations of the December 30 Budget were knowingly false.  The undisclosed material adverse effects regarding Customers A, B, C, E, and H alone would be expected to reduce APS's forecast of 2012 EBITDA by over $11 million, or 25 percent; this figure does not even account for the substantial fine that Customer A was threatening to impose.

66.    The closing date for the merger was March 2, 2012 (the "Closing Date").  On that date, Defendant Scott, acting for the benefit of all Defendants, executed and filed a Certificate of Merger merging APS Merger Sub, Inc. with and into APS with the Secretary of State of the State of Delaware.  Each of the Defendants knew or had reason to know that the Certificate of Merger would be filed in the State of Delaware.  The filing of the Certificate of Merger in Delaware was a direct and foreseeable result of the Defendants' scheme to defraud Universal.

67.    On March 2, 2012, APS delivered the Officer's Certificate required by Section 6.2(h)(i) of the Merger Agreement to Universal.  Defendant Scott signed the Officer's Certificate on behalf of APS that all of the representations and warranties in Section 3 of the Merger Agreement were true, including, among other things, that there had been no material adverse changes in APS's business since January 11, 2012, and that it was not in breach of the contract with Customer A or its other material contracts.  The Officer's Certificate failed to disclose any of the facts described in paragraphs 62 through 65, above.  All of these representations were false.

- 25 -

68.     On March 2, 2012, Universal paid $147.8 million in cash, which was used to retire debt, and approximately 6.5 million shares of Universal stock, then worth $76.7 million. The total purchase price, after post-closing working capital adjustments, was $222.3 million. Universal reasonably relied upon the representations made in the Merger Agreement, Company Disclosure Letter and the Officer's Certificate as well as the representations made in various presentations made to Universal when it made these payments.

**Post-Closing Revelations of APS's Actual Business Conduct**

69.     Immediately after the March 2, 2012 Closing Date, Universal began to learn about the deterioration in APS's customer relationships and business that Defendants had previously hidden from Universal.  Among other things:

(a)     By a letter dated March 16, 2012, Customer A formally notified APS that it was in default of its contract and demanded $1.88 million in penalties, precisely as Scott and Vaccaro had been told four months earlier.  When this letter arrived, the head of APS's operations for Customer A confessed to Universal that it had been "expected."  By letters dated May 18, 2012 and June 22, 2012, Customer A increased its demand to $5 million. On December 21, 2012, Universal, with the knowledge and consent of GTCR, settled the dispute and paid $3 million to Customer A.  Universal has incurred considerable additional expenses to bring APS into compliance with its obligations under the contract with Customer A.

(b)     The number of persons in APS's care in the ADHC program of Customer E fell from 37,000 to less than 1,400.  As a result, that contract fell 82 percent short of its projected EBITDA contribution to the 2012 Budget, a shortfall of several million dollars.

(c)     Customer E did not expand membership in its SPD program.  As a result, that contract fell 83 percent short of its projected EBITDA contribution to the 2012 Budget, another seven-figure shortfall.

- 26 -

(d)      As Defendants knew but did not disclose, Customer H refused to mandate that healthcare providers use APS's web-based portal for APS's Utilization Management contract. As a result, that contract's 2012 EBITDA contribution was actually negative, falling nearly $2 million short of its projected contribution to APS's 2012 EBITDA budget.

(e)      Confirming what APS essentially knew prior to Closing, in May 2012, APS was formally informed that the Customer C contract had been awarded to one of its competitors. The loss of the Customer C contract ultimately accounted for another significant shortfall to the 2012 Budget.

(f)      Audits of APS contracts with Customer I and a contract with Customer E for the management of persons with Severe Mental Illness ("SMI") disclosed deficiencies in the performance of those two contracts.

70.      The combined effect of these and other events was catastrophic. By April 10, 2012—less than six weeks after Defendant McDonough's reaffirmation of the 2012 budget of $44.8 million EBITDA—APS informed Universal that it then forecast only $27.1 million EBITDA for the year, a decline of 40 percent. By July 13, 2012, APS informed Universal that it then forecast only $4.1 million EBITDA for the year, a calamitous decline of more than 90 percent. It was only after making unplanned corporate expense reductions that APS was able to generate a scant $8 million of EBITDA in 2012. Universal initially allocated $163 million of APS's purchase price to goodwill; in its SEC Form 10-Q filing for the second quarter of 2013, filed on August 9, 2013, Universal announced that it was writing down the goodwill from the APS acquisition by $91.7 million on a pre-tax basis.

71.      The onslaught of revelations in the weeks and months after Universal acquired APS was no accident; Defendants knew of these material adverse facts at the time the Merger Agreement was executed on January 11 and at the time it was consummated on March 2 and

- 27 -

withheld their knowledge from Universal until they had secured the benefit of the more than

$220 million that Universal paid to obtain APS and (in the case of the Individual Defendants)

obtained lucrative compensation packages.

72.     In addition to the implosion of APS's business and business prospects, APS has

paid or been asked to pay penalties or restitution on multiple customer contracts, is party to

litigation regarding its contract performance and compliance and has been made the subject of

government investigations.  These claims and inquiries concern both contracts that were in force

at the time of the merger and former contracts that had been in effect after 2006.

**APS's New Business Prospects Failed to Materialize**

73.     The pipelines of new business prospects that APS provided to Universal in the

course of negotiating the Merger Agreement, and between the execution and the close of the

Merger Agreement, appeared to confirm Defendants' misrepresentations, made in the Merger

Agreement and elsewhere, that APS's business and its customer relationships were sound.

Those pipelines listed more than 30 new contracts that APS claimed it would more than likely

obtain in 2012.  In the year since the merger, APS failed to win all but *two* of these contracts,

which generated a mere $350,000 of EBITDA in 2012.

74.     Universal understood that there could be no guarantee that all of the projected

new business would materialize.  It did, however, rely upon APS to provide accurate statements

of current facts on the health of its business and its relationships with customers and potential

customers, and good-faith expressions of its opinions as to the likelihood of being awarded the

contracts described on the new business pipeline.  On the contrary, as Universal has since

learned, the pipelines that APS and the Individual Defendants presented to it fraudulently

mischaracterized APS's prospects of obtaining new business, including by listing a prospective

contract that APS knew it had lost.  The pipelines also fraudulently concealed that APS's

- 28 -

performance of its existing contracts with state Medicaid agencies and private health plans was materially deficient, because they were built upon the false premise that APS's customers were satisfied with APS's service.

75.     APS's sales team kept track of new business opportunities by inputting data into a database program called "salesforce.com." Each month, a printout of the salesforce.com report was provided to APS's senior managers, including the Individual Defendants. McDonough relied on the salesforce.com printouts to inform his preparation of materials regarding prospective new business for APS's Board of Directors.

76.     The reports generated by salesforce.com included, among other data, entries for the level of confidence that the contract would be awarded to APS, expressed as a percentage. The sales representatives, who were in direct contact with the customers and prospective customers, were required to update the entries for their new business opportunities on a weekly basis.

77.     Defendants Vaccaro and McDonough prepared the new business pipelines given to Universal by looking at the salesforce.com reports. However, instead of using the confidence levels assigned to the prospective contracts in those reports, Vaccaro and McDonough, with the knowledge and approval of Scott, systematically and fraudulently increased the probabilities of being awarded new business and the amount of that business in the pipelines given to Universal, without making any effort to reconcile their phony predictions with the very different views of the sales representatives and APS's senior development executives.

78.     For example, as described in paragraphs 46 and 48, above, McDonough's initial draft of the pipeline that was presented to Universal on November 22, 2011 projected only $18.1 million EBITDA from new business, but after the Defendants conferred, they gave Universal a

- 29 -

radically different document projecting $28.6 million EBITDA. The sham increase is attributable in large part to three changes:

(a)     adding four new or expanded contracts with Customer B. APS had been having difficulties implementing its existing contract with Customer B for services in California and had received written notice of material deficiencies in its performance. Nonetheless, the November 22 pipeline given to Universal projected several million in EBITDA from Customer B contracts that were falsely assigned probabilities of 75% to 90%. As APS predicted internally (but failed to tell Universal), none of these contracts was awarded to APS;

(b)     elevating the likelihood of the Dual Eligible contract for Customer F to "greater than 90%" from "less than 50%," even though Customer F had not yet even issued an RFP for that contract, Customer F had expressed dissatisfaction with APS's performance on its existing contract, and the internal salesforce.com documents continued to show only a 10 percent chance of APS's winning the Dual Eligible contract. Customer F never awarded a Dual Eligible contract to APS; and

(c)     adding more than $1 million of EBITDA for a new contract with Customer R and assessing the probability of being awarded that contract as greater than 90%, even though the bid had been submitted only the day before, on November 21, 2011, and the APS sales representative was told that while the proposal "look[ed] good," the state "won't know anything definite until early next week." This contract was not awarded to APS.

79.     Additionally, the chart below shows some of the enormous and inexplicable discrepancies between the December 30 Pipeline, given to Universal less than two weeks before the Merger Agreement was executed, and the internal salesforce.com pipeline at that time:

- 30 -

| Contract | Probability | | Annual Revenue | |
|---|---|---|---|---|
| | Given to Universal | APS Internal | Given to Universal | APS Internal |
| Customer J (LA Duals) | 75% to 90% | 30% | $11,900 | $1,000 |
| Customer K | > 90% | 40% | $5,000 | $3,000/$3,000[2] |
| Customer F (Dual Eligibles) | > 90% | 40% | $14,400 | none listed |
| Customer B (IN) | 75% to 90% | 50% | $8,000 | $2,500 |
| Customer L (OH) | 75% to 90% | 30% | $6,000 | none listed |
| Customer B (SC)[3] | 75% to 90% | ----- | $700 | ----- |
| Customer M | > 90% | 30% | $4,000 | $1,000 |
| Customer B (VA) | 75% to 90% | 50% | $6,000 | $2,500 |
| Customer J (THM) | 75% to 90% | 30% | $10,000 | none listed |

80.     The entries for potential contracts with Customer B in South Carolina, Indiana and Virginia were particularly misleading, since Customer B had said that it would not partner with APS in South Carolina and that it would sign no new contracts with APS until the Company had resolved its performance shortcoming in California. Shockingly, Defendants fraudulently listed four separate opportunities with Customer B on the December 30 Pipeline.

81.     Similarly, the February 2 Pipeline—the last pipeline provided to Universal before closing—was engineered to hide the significant decline in APS's existing relationships with customers, and in APS's prospects, since the December 30 Pipeline had been submitted to Universal:

(a)     Since the time of the December 30 Pipeline, APS had lost the Customer B contract in California and could no longer pretend to have any prospect of winning contracts with Customer B in other states. In addition, many states had postponed the timing for their RFPs, delaying the dates on which APS could begin to see revenue from those contracts, even if

---

[2]     The Customer K opportunity was for two separate contracts; APS knew that one of those contracts would not even be put out for bid until 2012.

[3]     The Customer B contract for South Carolina listed in the December 30 Pipeline did not even appear on APS's salesforce.com pipeline at the time because Customer B already had said it would not be awarded to APS.

RLF1 9496397v.1

they were awarded to APS after a highly competitive bidding process. As a result, the 2012

EBITDA projected on the December 30 Pipeline should have been reduced by $8 million, or

almost 30%.

      (b)    Defendant McDonough, with the approval of Defendants Scott and Vaccaro,

added eight purported new prospective contracts to the February 2 Pipeline that would be

submitted to Universal to conceal the full extent of the decline in prospective new business. As a

result of these bogus additions, the 2012 EBITDA projected on the February 2 Pipeline was only

$2 million less than the 2012 EBITDA projected on the December 30 Pipeline.

      (c)    Most of the eight newly-added prospects had been known to APS for months, yet

APS added them to the February 2 Pipeline even though (i) no objective event had occurred to

make them more probable of being awarded to APS and (ii) APS's sales force did not view them

as likely to be awarded to APS.

      82.    The following chart shows some of the new irreconcilable differences between

the February 2 Pipeline, given to Universal one month before the merger closed, and the internal

salesforce.com figures:

| Contract | Probability | | Annual Revenue | |
|---|---|---|---|---|
| | Given to Universal | APS Internal | Given to Universal | APS Internal |
| Customer I (Dual Eligibles) | 75% to 90% | 10% | $5,500 | none listed |
| Customer E (Dual Eligibles) | > 90% | 10% | $14,000 | $12,600 |
| Customer N (Dual Eligibles) | 50% to 75% | 30% | $8,600 | none listed |
| Customer O (Dual Eligibles)[4] | 75% to 90% | --- | $10,000 | --- |
| Customer P (Dual Eligibles) | 75% to 90% | 20% | $8,600 | none listed |
| Customer Q | 50% to 75% | 30% | $10,000 | $6,000 |

      83.    If not for Defendants' machinations, the February 2 Pipeline would have shown a

steep decline from the December 30 Pipeline and Universal would have known that APS's

---

[4]      The Customer O Dual Eligibles contract listed in the February 2 Pipeline did not even appear on
APS's salesforce.com pipeline at the time.

- 32 -

business relationships with existing customers and new business prospects were in doubt.

Universal relied on APS's false representations that APS's business and its relationships with

existing and prospective customers were robust and unimpaired in deciding to close the merger.

84.     The Defendants never gave Universal a current salesforce.com pipeline, though

Universal had requested one from Defendant McDonough prior to executing the Merger

Agreement.  This omission was a deliberate part of Defendants' campaign of deception and

concealment.  In an email exchange on February 1, 2012, after Universal's chairman had asked

for a "pipeline report," Defendant McDonough told Defendant Vaccaro that he did not want to

send Universal a salesforce.com printout because that would "bring up more questions" and

"open up a hornet's nest."

**Software Misrepresentations**

85.     During meetings and in written presentations to Universal, Defendants touted its

purportedly proprietary Software as the "chassis" of APS's service business.  In the course of

their discussions with Universal, Defendants were told that this "chassis" was of interest to

Universal not only as the foundation of APS's existing business, but also because Universal

planned to modify the Software so that it could be used in Universal's other business lines.

86.     Critically, Universal's plan to modify the Software for use in its other businesses

depended on having outright ownership of the software without restrictions.  In its written

presentations to Universal on August 18, 2011 and October 7, 2011, APS described the Software

as "proprietary."  Section 3.16(a) of the Merger Agreement represents that "Section 3.16(a) of

the Company Disclosure Letter sets forth a complete and correct list of the following categories

of Intellectual Property Rights that are owned by the Company and its Subsidiaries: . . . (v)

Software."  In Section 3.16(a) of the Company Disclosure Letter, APS expressly warranted that

the Software is "Owned Software."  Section 3.16(a) of the Company Disclosure Letter separately

- 33 -

lists "Licensed Software," thereby representing that items listed as "Owned Software" are not licensed.

87.     In the course of its due diligence, Universal learned that the Software was subject to a Software License, Consulting and Maintenance Agreement, dated as of March 31, 2006, by and between Innovative Resource Group, LLC d/b/a APS Healthcare and the Licensor (the "Software License"). On December 28, 2011, during a due diligence conference call on intellectual property issues with Universal's counsel, an APS in-house lawyer stated that the software covered by the Software License was only a "small component" of APS's purportedly proprietary Software.

88.     Several months after the merger closed, APS began to develop plans for a new version of the Software. In the course of this development, Universal was told that the software subject to the Software License was not, in fact, a "small component" of the Software. Rather, APS now acknowledges that the Software License provides the "nucleus" of the Software and constitutes at least 50 percent of its code. APS personnel have estimated that it would cost Universal millions of dollars to design the Software without reliance on the code that is subject to the Software License.

**Defendants' Material Misrepresentations and Omissions**

89.     The Defendants made numerous material misrepresentations to Universal prior to execution of the Merger Agreement, in the Merger Agreement itself, and afterwards, and also omitted to disclose material facts necessary to prevent other representations from being misleading.

90.     The Merger Agreement and Company Disclosure Letter contained the following material misrepresentations and omissions, among others. Where a contractual provision imposed an obligation on APS to disclose certain facts in the Company Disclosure Letter, the

failure to disclose those facts was both a material omission and a material misrepresentation that such facts did not exist.

(a)     The Merger Agreement and Company Disclosure Letter misrepresented that APS was in compliance with its contract with its largest customer, Customer A, and omitted any reference to several of the deficiencies discussed during Defendants Scott and Vaccaro's meeting with Customer A on November 22, 2011, in which Customer A stated its intent to send APS a deficiency letter and impose a fine (collectively, the "Customer A Violations"). The Company Disclosure Letter's statement that APS was "discussing the appropriate measure of network adequacy (for providers with multiple offices)" with Customer A was deliberately misleading in light of Customer A's clear statements that APS was in breach of numerous contract provisions at the November 22 meeting with APS. These misrepresentations and omissions were material, and disclosure of the meeting with Customer A was necessary to make other disclosures not misleading, because, among other things, Universal had specifically asked APS to be prepared to talk about any problems with respect to the Customer A contract at the meeting among APS, GTCR, and Universal on November 22. The truth came to light with Customer A's letters of March 16, May 18, and June 22, detailing APS's breaches of its contract with Customer A and demanding a $5 million penalty. APS misrepresented in the Merger Agreement and Company Disclosure Letter that no such conditions existed. APS had an obligation to provide this information under the Merger Agreement.

(b)     The Merger Agreement and Company Disclosure Letter misrepresented that APS was in compliance with its material customer contracts and omitted any reference to certain of the material deficiencies identified by Customer B in its Corrective Action Plan for APS (the "Customer B Deficiencies"). APS misrepresented in the Merger Agreement and Company

- 35 -

Disclosure Letter that no such conditions existed.  APS had an obligation to provide this information under the Merger Agreement.

      (c)     The Merger Agreement and Company Disclosure Letter did not disclose the adverse effect of Customer D's interpretation of its contract with APS, which eviscerated the profitability of that contract (the "Customer D Shortfall").

      (d)     The Merger Agreement and Company Disclosure Letter did not disclose the adverse effect of the settlement Customer E had reached with private plaintiffs regarding its ADHC program (the "Customer E Settlement").  Both McDonough and Vaccaro received assessments from APS personnel on or around November 29, 2011, in which they were told that APS was likely to lose business as a result of the settlement and that the settlement created great uncertainty.  APS misrepresented in the Merger Agreement and Company Disclosure Letter that no such conditions existed.  APS had an obligation to provide this information under the Merger Agreement.

      (e)     In Section 3.16 of the Merger Agreement and Company Disclosure Letter, APS misrepresented that it owned the Software that formed the core of its business (the "Software Misrepresentation").  This representation was false because over half of the code in the Software is subject to the Software License.

      (f)     Contrary to representations in the Merger Agreement and the Company Disclosure Letter, APS was in breach of its contract with Customer I (the "Customer I Breach").  These breaches were uncovered by an audit performed by Ernst & Young.  APS had an obligation to disclose any material breaches under the Merger Agreement.

      (g)     Contrary to representations in the Merger Agreement and the Company Disclosure Letter, APS was in breach of its SMI contract with Customer E (the "SMI Breach").

- 36 -

These breaches were uncovered by an audit performed by Ernst & Young. APS had an obligation to disclose any material breaches under the Merger Agreement.

     (h)    The Merger Agreement and Company Disclosure Letter failed to disclose that APS was in breach of its Disease Management and Case Management contract with Customer S (the "Customer S Breach"). These breaches were uncovered by an internal audit performed by APS after the merger closed. APS had an obligation to disclose any material breaches under the Merger Agreement.

     (i)    The Merger Agreement and Company Disclosure Letter did not disclose other facts that are the subject of pending litigation and government investigations.

     91.    The Officer's Certificate signed by Defendant Scott and provided by APS to Universal at Closing on March 2, 2012 contained the following material misrepresentations and omissions, among others, in breach of APS's obligations under the Merger Agreement:

     (a)    The Officer's Certificate failed to disclose the ongoing Customer A Violation.

     (b)    The Officer's Certificate failed to disclose the expected adverse effect of the Customer E Settlement, which had been approved by the court in January 2012 after the Merger Agreement had been signed.

     (c)    The Officer's Certificate failed to disclose that on or about January 20, 2012, APS was informed that Customer E would cut the revenue for its CMSP contract in half from $4.1 million to $2 million (the "CMSP Reduction").

     (d)    The Officer's Certificate failed to disclose the Customer B Deficiencies and the fact that Customer B's post-termination letter on or about February 15, 2012 confirmed that such deficiencies were material.

     (e)    The Officer's Certificate failed to disclose that the 2012 Budget was no longer accurate because it assumed income throughout the year from the Customer C contract that had

been set for rebid (the "Customer C Rebid") even though the rebid was made under circumstances that ensured APS would not win it.

      (f)     The Officer's Certificate failed to disclose the ongoing Customer I Breach.

      (g)     The Officer's Certificate failed to disclose the ongoing SMI Breach.

      (h)     The Officer's Certificate failed to disclose the Customer D Shortfall.

      (i)     The Officer's Certificate failed to disclose that the Company learned in a meeting with Customer H during the week of January 17, 2012, that the implementation of its contract with Customer H was not proceeding according to APS's expectations or the RFP (the "Customer H Implementation Problems") and that as a result the Company would experience a significant shortfall relative to the earnings for the Customer H contract that it had projected in its budget for 2012 (the "Customer H Shortfall"). The 2012 budget's projection of the cost of performing the Customer H Utilization Management contract was based on an assumption that Customer H had mandated that providers use APS's web portal, which was false (the "False Customer H Portal Assumption").

      (j)     The Officer's Certificate failed to disclose that on or about February 6, 2012, APS learned that one of its competitors had been selected for the renewal of a PHM contract with Customer G for a term beginning July 1, 2012 (the "Customer G Termination"), and that, because that contract had been included in APS's 2012 Budget, this event would cause APS to experience a shortfall to its 2012 Budget.

      (k)     The Officer's Certificate failed to disclose that, as Defendants well knew, the Company had made a $1.5 million error in calculating benefits as part of its contract with Customer A for 2012 and therefore the 2012 Budget was overstated by $1.5 million (the "Customer A Budget Error").

      (l)     The Officer's Certificate failed to disclose the ongoing Customer S Breach.

- 38 -

(m)     The Officer's Certificate failed to disclose that the foregoing matters, individually and collectively, could have a material adverse effect on the Company's business, and affirmatively misrepresented the absence of a material adverse effect.

92.     The 2012 Budget that APS sent to Universal on December 30, 2011 contained the following material misrepresentations and omissions, among others:

(a)     The 2012 Budget failed accurately to reflect the adverse effect of the Customer E Settlement on the revenue and EBITDA from the ADHC contract with Customer E.

(b)     The 2012 Budget assumed that APS would retain the PHM contract with Customer G, thereby failing accurately to reflect APS's belief that it had already failed to become a finalist for the rebid on that contract.

(c)     The 2012 Budget reflected a baseless assumption that APS would achieve $19.3 million EBITDA from new business.

93.     The August Presentation contained the following material misrepresentations and omissions, among others:

(a)     The pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contributions.

(b)     The pipeline was intentionally overstated because it contemplated several new contracts with Customer B, while APS knew that its existing contract with Customer B in California was troubled.

(c)     The presentation intentionally misrepresented that the contract with Customer D provided APS with millions of dollars in annual EBITDA. This was false and misleading because APS, the GTCR Defendants, and the Individual Defendants knew that APS had

- 39 -

seriously underestimated the cost of performing its contract for Customer D, and of the resulting Customer D Shortfall.

94.     The October Presentation made the following material misrepresentations and omissions, among others:

(a)     The pipeline intentionally failed to reflect the Individual Defendants' assessment that APS would see $5.2 million less in EBITDA in 2012 from its new business pipeline than had been projected in the August Presentation.

(b)     The pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution.

(c)     The pipeline was intentionally overstated because Customer B was dissatisfied with APS's performance on its existing contract and had already told APS that it would not partner with APS in South Carolina.

(d)     The October Presentation also intentionally misrepresented that the Customer D contract provided APS with several million dollars in annual EBITDA.  This representation was false and misleading because of the Customer D Shortfall, as described above.

95.     At the November Meeting and in the pipeline presented to Universal at the November Meeting, the Individual Defendants, APS, and the GTCR Defendants made the following material misrepresentations and omissions, among others:

(a)     The Defendants omitted any disclosure of Scott's and Vaccaro's meeting with Customer A or the Customer A Violations.

(b)     The pipeline provided to Universal at the November Meeting intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the

- 40 -

listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution.

(c)     The pipeline was intentionally overstated because it contemplated several new contracts with Customer B, while APS knew that Customer B was dissatisfied with APS's performance on its existing California contract, that Customer B had declined to partner with APS in South Carolina, and that Customer B would not award any more contracts to APS until APS had remedied its deficient performance in California.

(d)     The pipeline was intentionally overstated because it stated that a contract with Customer R was "Highly Likely" to be awarded to APS when APS had not received any response to its bid, which had been submitted just one day earlier.

(e)     After being confronted with Customer F's decision to move to managed care, which they did not disclose to Universal, Defendants asserted without any basis that APS would see increased revenues from Customer F.

96.     The December 30 Pipeline contained the following material misrepresentations and omissions, among others:

(a)     The December 30 Pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution.

(b)     The December 30 Pipeline was intentionally overstated because it contemplated several new contracts with Customer B, while APS knew that Customer B was dissatisfied with APS's performance on its existing California contract, that Customer B had declined to partner with APS in South Carolina, and that Customer B would not award any more contracts to APS until APS had remedied its deficient performance in California.

- 41 -

97.     The February 2 Pipeline contained the following material misrepresentations and omissions, among others:

(a)     The February 2 Pipeline intentionally overstated the revenues and probabilities shown in APS's own internal records for many of the listed contracts, and was not a good-faith assessment of the likelihood of specific contracts' ability to generate 2012 EBITDA contribution.

(b)     The Individual Defendants intentionally failed to disclose adverse developments that were known to them or reflected in the salesforce.com pipelines that they had received. For instance, the salesforce.com pipeline in early February 2012 noted that on or about January 20, 2012, APS was informed that the revenue for the CMSP contract with Customer E would be cut in half, but the pipeline provided to Universal still reflected the old (and higher) revenue figure.

(c)     The Individual Defendants inflated the February 2 Pipeline by adding several new prospective contracts without justification to cover up the fact that the projected EBITDA from new business would otherwise have dropped dramatically because of the loss of APS's existing and prospective contracts with Customer B.

98.     Defendant McDonough misrepresented to Universal on December 13, 2011 that the Customer E Settlement had only upside potential for APS. This was false because in fact the Customer E Settlement would more likely decrease APS's income, as described above.

99.     On January 4, 2012, APS executives (including Defendants Scott and Vaccaro) met with Universal and represented that APS had remedied any shortcomings in its compliance programs identified as part of the False Claims Act case and that APS was in compliance with its contracts and all applicable laws. Defendant Katz participated in this meeting by telephone.

100.    In two separate phone calls on or around February 14, 2012 and February 29, 2012, Defendant McDonough made the following material misrepresentations and omissions among others:

- 42 -

(a)     Defendant McDonough reaffirmed all of the false and misleading statements and omissions in the 2012 Budget as described above, and failed to disclose changes in circumstances that rendered prior statements inaccurate.

(b)     Defendant McDonough failed to disclose the Customer C Rebid.

(c)     Defendant McDonough failed to disclose the Customer H Implementation Problems, the Customer H Shortfall, and the False Customer H Portal Assumption.

(d)     Defendant McDonough failed to disclose the Customer G Termination and the Customer G Budget Shortfall.

(e)     Defendant McDonough failed to disclose to Universal that the 2012 Budget contained a $1.5 million overstatement of earnings from Customer A, despite the fact that such disclosure was required in order to make the previous disclosure of the budget not misleading.

101.    APS and the Individual Defendants had an obligation to disclose the Customer C Rebid because they had represented to Universal in the August Presentation, the October Presentation and the 2012 Budget that APS had won the Customer C contract.  Their failures to correct these statements constitute a material omission.

**Defendants' Material Misrepresentations and Omissions Were Made with Scienter**

102.    As described above, the foregoing misrepresentations and omissions were made knowingly and intentionally.  In the alternative, the misrepresentations and omissions were made with reckless indifference as to their truth or falsity because the Defendants failed to obtain sufficient information about the Company's operations to prepare an accurate 2012 budget, new business pipelines, or an accurate description of the Company's ongoing business.

103.    As described below, the Defendants also had the motive and opportunity to defraud Universal.

- 43 -

104.    As a result of the sale of APS to Universal, each of the Individual Defendants exchanged their illiquid shares of APS for valuable and liquid Universal stock, receiving the following consideration:

(a)    Scott received a total of 175,370 shares of Universal stock, valued at more than $2 million on the Closing Date. He also obtained 319,800 stock options.

(b)    Vaccaro received a total of 56,983 shares of Universal stock, valued at more than $654,000 on the Closing Date. He also obtained 196,800 stock options.

(c)    McDonough received a total of 24,148 shares of Universal stock, valued at more than $277,000 on the Closing Date. He also obtained 83,400 stock options.

105.    The Individual Defendants each also signed new Employment Agreements that provided for significant increases in their annual compensation:

(a)    Scott's base salary increased from $375,000 to $530,000 per year, an increase of 41 percent.

(b)    Vaccaro's base salary increased from $335,000 to $475,000 per year, an increase of 42 percent.

(c)    McDonough's base salary increased from $285,000 to $350,000 per year, an increase of 23 percent.

106.    The GTCR Defendants had the motive and opportunity to defraud Universal because they were at risk of losing their entire investment in APS if the Company were to default on its debt. Under the terms of the Company's loans, APS would have gone into default of its loan covenants if 2012 EBITDA dropped below $29 million. Given the material adverse effects that occurred in the fall of 2011 and the first two months of 2012, such a decline was a near certainty.

- 44 -

107.    Instead of losing their entire investment by reason of a default and subsequent foreclosure on their equity interest, the GTCR Defendants were the beneficiaries of the $222.3 million purchase price, including approximately $77 million in Universal common stock, which in turn provided substantial benefits not only to the GTCR Defendants' investors but also to the GTCR Defendants and their affiliates.

108.    Pursuant to a letter agreement entered as part of the merger, Defendant Katz was designated as a member of Universal's Board of Directors.  In connection with this appointment, Katz has received valuable compensation, as well as the prestige of serving as a director of a publicly traded company.  In particular, Katz received a total of $172,000 in fees, stock awards, and options awards during 2012 in connection with his membership in Universal's Board of Directors.  Katz retained these benefits personally, rather than instructing Universal to pay them to a GTCR affiliate.

### The Role of the GTCR Defendants in the Fraud

109.    The GTCR Defendants culpably participated in the fraud committed by APSLP and the Individual Defendants because, among other things:

(a)    GTCR personnel were regularly apprised of APS's business and prospects at board meetings, in emails and in telephone calls with the Individual Defendants, and knew the true condition of APS's business;

(b)    GTCR personnel reviewed and approved drafts of the presentations made to Universal;

(c)    GTCR personnel attended many of the meetings with presentations made to Universal, including without limitation the meetings on August 18, 2011 and November 22, 2011;

- 45 -

(d)     GTCR personnel dealt directly with APS's lenders, knew that they were nervous about the Company's future and knew that another loan covenant default would spell the death of APS and the loss of their investment;

(e)     GTCR personnel directed and controlled the due diligence process and participated in nearly all of the due diligence calls and meetings with Universal regarding the transaction; and

(f)     GTCR personnel were directly involved in every aspect of the negotiation of the Merger Agreement and its representations and warranties.

110.    GTCR's conscious participation in the fraud is evidenced by its knowledge of APS's misrepresentations in the written presentations to Universal. For example, as members of the APS board, Defendant Katz and Nolan received reports that the Customer D contract was losing money, but reviewed and approved the August and October Presentations to Universal that claimed the contract generated millions of dollars of EBITDA per year. Defendant Katz and Nolan also received reports to the APS board showing that a potential contract with Customer B in South Carolina was no longer a prospect, but reviewed and approved new business pipelines given to Universal showing that APS had a 75 to 90 percent chance of being awarded that contract. And, on information and belief, Defendant Katz and Nolan were informed of the threat that Customer A would fine APS or terminate the Customer A contract, but said nothing about that threat to Universal.

111.    The GTCR Defendants also stood to gain substantial compensation in the merger, including valuable and publicly traded Universal shares, as well as the right to appoint a member to Universal's Board of Directors. Defendant Katz was the direct beneficiary of that right, which brought with it stock awards, options awards and director fees. By contrast, if the GTCR Defendants had not sold APS to Universal, they would have lost their entire investment.

112.   The Defendants knew that the undisclosed material adverse effects that occurred *before* the merger closed necessarily would have caused APS's 2012 EBITDA to fall below $29 million, resulting in a breach of its loan covenants, and a default on its $150 million of debt. The actual results were far worse—only $8 million of EBITDA. When GTCR sold APS to Universal, it knowingly and intentionally dodged a lethal bullet by putting Universal in its place. The GTCR Defendants aided and abetted the Individual Defendants' and APSLP's fraud with full knowledge of the grave harm they would cause Universal and with reckless indifference to the rights of Universal.

**Misrepresentations Caused Significant Losses to Universal**

113.   Universal would not have purchased APS if it had known the truth about the numerous misrepresentations and omissions described above.

114.   Universal reasonably relied on each of the misrepresentations and omissions described above.

115.   Defendants' misrepresentations, omissions and breaches of the Merger Agreement have caused Universal to suffer actual losses, including without limitation:

(a)   the $222.3 million purchase price paid for APS;

(b)   undisclosed liabilities, penalties, performance guarantees and fines;

(c)   expenses incurred to bring APS into compliance with customer contracts;

(d)   compensation paid to Defendant Katz in his capacity as a member of the Universal Board of Directors;

(e)   attorneys' fees for lawsuits and investigations;

(f)   expenses for developing new software that would not have been incurred if APS owned the Software as represented; and

- 47 -

(g)    cash dividends of approximately $16 million paid to GTCR on its Universal shares.

116.    The Individual Defendants and APSLP perpetrated their fraud with full knowledge of the grave harm they would cause Universal and with reckless indifference to the rights of Universal. This outrageous, deceptive conduct constitutes aggravated and gross fraud. The conduct of all Defendants justifies an award of award of punitive damages to punish their willful deception and to deter similar misconduct by them and by others in the future.

**Indemnification Under The Merger Agreement and the Limited Guaranty**

117.    In Section 8.2 of the Merger Agreement, APSLP agreed to indemnify Universal for breaches of the representations, warranties, and covenants in the Merger Agreement, subject to certain floors and caps set forth in that agreement.

118.    Each of the misrepresentations and omissions identified above also constitutes a breach of the representations, warranties and covenants in the Merger Agreement.

119.    The parties recognized that APSLP would hold only limited assets after its shares of APS had passed to Universal as part of the Transaction. Therefore, "[t]o induce Parent to enter into the Merger Agreement," the Merger Agreement and associated Limited Guaranty provide that the GTCR Limited Guarantors "absolutely, unconditionally and irrevocably guarantee[]" APSLP's indemnification obligations to Universal. Limited Guaranty ¶ 1.

120.    In Section 8.2(a)(vi) of the Merger Agreement, APSLP also agreed to indemnify Universal for any Excess Performance Guarantee Amounts, which the Merger Agreement elsewhere defined as 50 percent of the amount by which APS paid performance guarantees above the amount previously accrued or reserved. Universal agreed to pay $195,000 in excess of the amount previously accrued or reserved with respect to a performance guarantee assessed by Customer T.

- 48 -

121.     On March 1, 2013, Universal delivered a demand for indemnification on APSLP, thereby triggering its right to indemnification under the Merger Agreement and the Limited Guaranty.

122.     On August 22, 2013 and September 19, 2013, Universal delivered supplemental demands for indemnification on APSLP, identifying additional breaches it had discovered.

### Count I – Securities Fraud under Section 10(b) of the Exchange Act
### (Against the Individual Defendants and APSLP)

123.     Plaintiff repeats each and every allegation contained above as if set forth fully herein.

124.     As set forth above, the Individual Defendants and APSLP made a number of material misstatements and omissions of material fact to the Plaintiff's officers and agents in the course of negotiating and signing the Merger Agreement and related documents.

125.     These material misstatements and omissions of material fact were made in connection with the sale of Universal securities, which are publicly traded on a national securities exchange.

126.     The Individual Defendants and APSLP made these misrepresentations with scienter.  Specifically, the facts pleaded herein give rise to a strong inference that the Individual Defendants and APSLP made the misrepresentations with the intent to defraud Plaintiff or did so recklessly, including because they had motive and opportunity to engage in wrongful conduct.

127.     These misrepresentations were conveyed by means of the mails and interstate telecommunications networks.

128.     As more fully described above, Plaintiff acquired APS in reliance on representations made in the course of negotiations and set forth in the Merger Agreement. Plaintiff's reliance was reasonable because the misstatements by APSLP and the Individual

- 49 -

Defendants concerned material financial and operational information about APS that APSLP and the Individual Defendants were in a position to know and had a duty to know and to which Universal did not have independent access. Indeed, Defendants purposefully kept updates of material adverse information from Plaintiff. Absent these misrepresentations and omissions by APSLP and the Individual Defendants, and others acting on their behalf, Plaintiff would not have acquired APS.

129.   These misstatements are not subject to the Safe-Harbor for Forward Looking Statements provision of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements concerned both known facts and future predictions that Defendants knew were baseless and material, and were not accompanied by meaningful cautionary language.

130.   As a direct and proximate result of the fraudulent misrepresentations regarding the viability of APS's business, Plaintiff sustained actual damages well in excess of $150 million.

### Count II – Control Person Liability under Section 20(a) of the Exchange Act
### (Against the GTCR Defendants)

131.   Plaintiff repeats each and every allegation contained above as if set forth fully herein.

132.   A majority of the members of the APS Board of Directors were employed by or agents of one or more of GTCR, GTCR Partners IX, or the GTCR Limited Guarantors.

133.   GTCR was general partner of GTCR Co-Invest and GTCR Partners IX.

134.   GTCR Partners IX was general partner of GTCR Fund IX/A and GTCR Fund IX/B.

135.   APSLP held APS for the benefit of the GTCR Limited Guarantors.

- 50 -

136.     Defendant Katz, GTCR, GTCR Partners IX, and the GTCR Limited Guarantors were regularly informed by APS regarding APS's business, and Defendant Katz, GTCR, GTCR Partners IX, and the GTCR Limited Guarantors directed APS's activities.

137.     The GTCR Defendants, by and through Defendant Katz, Nolan, Earl, Kos, and other individuals, were heavily involved in the negotiations over the Transaction, controlled the terms of the due diligence and the deal, reviewed drafts of the presentations to Plaintiff and approved them.

138.     As a result, the GTCR Defendants were controlling persons of APS within the meaning of Section 20(a) of the Exchange Act. The GTCR Defendants were able to and did control the content of statements made by APS to Plaintiff.

139.     As more fully described above, the GTCR Defendants were aware of the circumstances surrounding Plaintiff's acquisition of APS and the negotiation of the terms thereof. The GTCR Defendants were aware that APS misrepresented and omitted material information about its financial and operational viability, and the GTCR Defendants actively and substantially participated in those material misstatements and omissions.

140.     APS, though its officers and agents, including the Individual Defendants, knowingly violated Section 10(b) of the Exchange Act by its material misstatements and omissions, as alleged in this Complaint.

141.     Plaintiff relied on APS's misstatements in deciding to acquire APS. The GTCR Defendants are responsible for APS's material misstatements and omissions as control persons of APS.

142.     As a direct and proximate result of the GTCR Defendants' conduct, Plaintiff sustained actual damages well in excess of $150 million.

- 51 -

### Count III – Fraud
### (Against the Individual Defendants and APSLP)

143.    Plaintiff repeats each and every allegation contained above as if set forth fully

herein.

144.    As described in further detail above, the Individual Defendants and APSLP made

a number of misrepresentations in the Merger Agreement and Company Disclosure Letter.

145.    In addition, Defendant Scott signed the Officer's Certificate, certifying that the

Company's representations, warranties, and covenants in the Merger Agreement were true.

146.    The Individual Defendants and APSLP knew that the representations contained in

the Merger Agreement, Company Disclosure Letter and Officer's Certificate were false or were

misleading half-truths.

147.    The Individual Defendants and APSLP fraudulently concealed the truth about

APS from Plaintiff, both within the Merger Agreement, Company Disclosure Letter and

Officer's Certificate and in the course of the parties' negotiations, as described above.

148.    The Individual Defendants and APSLP intended for Plaintiff to rely and Plaintiff

in fact reasonably relied on the misrepresentations and omissions regarding APS in deciding

whether or not to acquire APS and in deciding the appropriate consideration to be provided for

APS, including compensation that flowed to the Individual Defendants.

149.    As a direct and proximate result of the fraudulent representations and omissions,

Plaintiff sustained damages well in excess of $150 million.

### Count IV – Aiding and Abetting Fraud
### (Against the GTCR Defendants)

150.    Plaintiff repeats each and every allegation contained above as if set forth fully

herein.

- 52 -

151.    As described in further detail above, the Individual Defendants, APS, and APSLP committed fraud against Plaintiff by making numerous misrepresentations in the Merger Agreement, Company Disclosure Letter and Officer's Certificate.

152.    The GTCR Defendants knew that the Individual Defendants, APS, and/or APSLP were committing fraud against Plaintiff and fraudulently concealing the truth from Plaintiff.

153.    The GTCR Defendants provided substantial assistance to the Individual Defendants, APS, and/or APSLP by, among other things, failing to correct statements made to Universal that the GTCR Defendants knew were false.

154.    As a direct and proximate result of the fraudulent representations and omissions, Plaintiff sustained damages well in excess of $150 million.

### Count V – Fraud in the Inducement
### (Against the Individual Defendants and APSLP)

155.    Plaintiff repeats each and every allegation contained above as if set forth fully herein.

156.    As described in further detail above, the Individual Defendants and APSLP made a number of representations in the Merger Agreement, Company Disclosure Letter and Officer's Certificate concerning APS's compliance with the terms of its contracts with its customers, including without limitation Customer A, the absence of material adverse effects, and APS's ownership of intellectual property.

157.    Defendant Scott signed the Officer's Certificate, certifying that the Company's representations, warranties, and covenants in the Merger Agreement were true.

158.    The Individual Defendants and APSLP knew that the representations contained in the Merger Agreement, Company Disclosure Letter and Officer's Certificate were false or were misleading half-truths.

- 53 -

159.    The Individual Defendants and APSLP fraudulently concealed the truth about APS from Plaintiff, both within the Merger Agreement and in the course of the parties' negotiations, as described above.

160.    The Individual Defendants and APSLP intended for Plaintiff to rely on the misrepresentations and omissions regarding APS in deciding whether or not to acquire APS and Plaintiff did in fact reasonably rely on those misrepresentations and omissions.

161.    As a direct and proximate result of the fraudulent representations and omissions, Plaintiff was fraudulently induced to enter into the Merger Agreement and to close the Transaction.  Plaintiff would not have acquired APS if it had known the truth.  Plaintiff is entitled to rescission or rescissory damages as a result of having been fraudulently induced to enter into the Transaction.

### Count VI – Aiding and Abetting Fraud in the Inducement
### (Against the GTCR Defendants)

162.    Plaintiff repeats each and every allegation contained above as if set forth fully herein.

163.    As described in further detail above, the Individual Defendants, APS, and APSLP committed fraud in the inducement against Plaintiff by making numerous misrepresentations in the Merger Agreement, Company Disclosure Letter and Officer's Certificate.

164.    The GTCR Defendants knew that the Individual Defendants, APS, and/or APSLP were committing fraud in the inducement against Plaintiff.

165.    The GTCR Defendants provided substantial assistance to the Individual Defendants, APS, and/or APSLP by, inter alia, failing to correct statements made to Plaintiff that the GTCR Defendants knew were false.

166.    As a direct and proximate result of the fraudulent representations and omissions, Plaintiff was fraudulently induced to enter into the Merger Agreement and to close the

- 54 -

Transaction.  Plaintiff would not have acquired APS if it had known the truth.  Plaintiff is entitled to rescission or rescissory damages as a result of having been fraudulently induced to enter into the Transaction.

<b>Count VII – Breach of Contract<br>(Against APSLP and the GTCR Limited Guarantors)</b>

167.    Plaintiff repeats each and every allegation contained above as if set forth fully herein.

168.    Subject to and in the alternative to the fraud in the inducement claims above, the Merger Agreement and related documents including the Limited Guaranty and the Company Disclosure Letter constitute a valid, binding, and enforceable contract by and among Plaintiff and APSLP and the GTCR Limited Guarantors.

169.    In addition to the above-described breaches of the representations and warranties set forth in Sections 3.9, 3.16, 3.17, 3.25 and 3.29 of the Merger Agreement, the foregoing conduct also breached the covenants set forth in Sections 5.2(a)(iii), 5.2(a)(iv), and 5.2(h) of the Merger Agreement.

170.    APSLP has breached its obligations to Plaintiff under Section 8.2(a) of the Merger Agreement by failing to indemnify Plaintiff for losses it has incurred arising out of the above-described breaches of the representations and warranties set forth in Sections 3.9, 3.16, 3.17, 3.25 and 3.29 of the Merger Agreement, and in the certificate delivered pursuant to Section 6.2(h)(i) of the Merger Agreement, as well as for losses Plaintiff has incurred arising out of the breach of the covenants made in Sections 5.2(a)(iii), 5.2(a)(iv), and 5.2(h) of the Merger Agreement.

- 55 -

171.    The GTCR Limited Guarantors are conditionally liable for the above-discussed breaches of contract to the extent APSLP does not have sufficient assets to satisfy its indemnification obligations under the Merger Agreement.

172.    Additionally, APSLP is liable to Plaintiff for the Excess Performance Guarantee Amount identified in its March 1, 2013 demand for indemnification.

173.    In the aggregate, the facts alleged above had, or would reasonably be expected to have, a Company Material Adverse Effect, constituting a breach of the representations and warranties made in Section 3.9 of the Merger Agreement and in the certificate delivered pursuant to Section 6.2(h)(i) of the Merger Agreement.

174.    Plaintiff has complied in all material respects with its obligations under the terms of the Merger Agreement.

175.    As a direct and proximate cause of APSLP and the GTCR Limited Guarantors' breaches of the Merger Agreement, Plaintiff has sustained substantial damages.

### Count VIII – Conspiracy to Commit Fraud
### (Against the Individual Defendants, APSLP, and the GTCR Defendants)

176.    Plaintiff repeats each and every allegation contained above as if set forth fully herein.

177.    As alleged above, the Defendants are liable for fraud and fraud in the inducement.

178.    The Defendants conspired and combined with one another for the unlawful purpose of defrauding Universal.

179.    Plaintiff has suffered substantial damage as a result of Defendants' fraud and unlawful conspiracy to commit fraud.

- 56 -

### Count IX – Unjust Enrichment and Constructive Trust
### (Against the Individual Defendants, APSLP, and the GTCR Defendants)

180.    Plaintiff repeats each and every allegation contained above as if set forth fully herein.

181.    The Defendants obtained Universal shares through the fraudulent and deceptive acts described above.

182.    Since the Defendants obtained the Universal shares by fraud, Plaintiff has issued dividends to record owners of its common stock.

183.    Because the Defendants obtained their Universal shares and dividend payments through fraudulent, unfair, and unconscionable conduct, they have been unjustly enriched at Plaintiff's expense.

184.    Imposition of the constructive trust is necessary to prevent Defendants from unfairly profiting as a result of their fraudulent acts.

185.    This Court should impose a constructive trust in favor of Universal on the Universal shares obtained by the Individual Defendants, APSLP, and the GTCR Defendants, and upon all proceeds derived therefrom, including dividend payments received by the Defendants as owners or beneficial owners of Universal shares.

- 57 -

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    awarding all damages, including rescissory damages, expectation damages, and compensatory damages, and other remedies set forth in the Exchange Act, in favor of Plaintiff in an amount to be proven at trial, including interest thereon;

b.    imposing a constructive trust upon the Universal shares obtained by the Defendants as a consequence of the Merger Agreement, and upon all dividends paid or payable with respect to those shares;

c.    rescinding the Merger Agreement;

d.    in the alternative, awarding rescissory damages because Plaintiff was fraudulently induced to enter the Transaction but rescission would be impractical at this point in time;

e.    indemnifying Plaintiff for all losses resulting from any breach of the Merger Agreement;

f.    awarding punitive damages in an amount to be determined at trial; and

RLF1 9496397v.1

g.     awarding such other and further relief as the Court may deem just and
       proper.

/s/ Blake Rohrbacher
Blake Rohrbacher (# 4750)

*Of Counsel:*

Kelly E. Farnan (#4395)
Travis S. Hunter (#5350)

Andrew J. Levander
Linda C. Goldstein
Paul C. Kingsbery
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
212-698-3500
andrew.levander@dechert.com
linda.goldstein@dechert.com
paul.kingsbery@dechert.com

Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
rohrbacher@rlf.com
farnan@rlf.com
hunter@rlf.com

Elisa T. Wiygul
Dechert LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
215-994-4000
elisa.wiygul@dechert.com

Dated: October 22, 2013

*Attorneys for Plaintiff Universal American
Corporation*

RLF1 9496397v.1